Follett, J.
Appeal from a judgment entered on a verdict, and from an order denying a motion for a new trial made on the minutes, heard on a case containing all the-evidence; and an appeal from an order appointing at the trial, nunc pro tune, a guardian ad litem for the plaintiff.
The defendant owns and operates an iron mine, which isl entered from the side of a hill by a horizontal tunnel, which, at a little distance from the entrance, divides into two tunnels, one leading west and the other north, to what are called the west mine and the north mine. In fact, there is but one mine, which is entered by two tunnels. In each of these tunnels there is an iron track laid upon ties, extending to the place outside of the mine where the ore is dumped.
There is a stationary “steam engine standing near the mouth of the mine, by which cars loaded with ore are drawn from the mine on these tracks to the dump by a wire cable, one end of which is attached to a car, and the other end to a drum turned by the engine. From the entrance of the tunnel, the track entering the north mine *640 descends rapidly for a distance of 260 feet, and thence to the place where the ore is taken up, for a distance of about seventy-five feet, the track is substantially level. From the entrance to the tunnel, an empty car, restrained by the wire cable, ran by the force of its own gravity, to the foot of the incline; and then it was pushed back by the employees to the place where it was loaded with ore. When the car was loaded, the wire cable was attached to.the draw-iron on the car, and then it was drawn by the engine to the dump- outside of the mine. While a loaded car was being drawn out it was the duty of the employees to place in position and load an empty car.
The plaintiff began work for the defendant January 6, 1886, and worked continually in the west tunnel until January 26th, when he and others were directed to enter the north tunnel and clear the track from ice. This tunnel had not been used for some months, and considerable ice had accumulated upon the bottom. The ice was not removed from the tunnel, but was piled up three or four feet high on both sides of the track. Defendant’s boss testified that the ice was removed for about two feet outside of each rail, and made a pile about two feet thick alongside of each track.
The distance from the track to the side of the tunnel varied from ten to twenty-five feet.
January 27, 1886, the plaintiff and several others were engaged in loading cars with ore, and as one car was about to be drawn on in the mode described, the superintendent directed the plaintiff and others to push an empty car back and load it. While the loaded car was being drawn upon the incline, the draw-iron, to which the cable is attached, broke and the car ran back into the mine, severely injuring the plaintiff, who was then at work with others in placing the empty car in position to be loaded.
The plaintiff claims that defendant was negligent in leaving the ice along the track, in not sufficiently lighting the mine, and in using a car with a weak and defective draw iron.
That Silas W. Johnson superintended the daily working of the mine, controlled the operatives, had the care of the implements, and in these respects respresentedthe defendant, was hardly disputed oh the trial, and is settled in the plaintiff’s favor by the verdict. He testified, “I was the boss in the ore bed of the defendant at Keene’s; I was there at the time this accident happened; my duties were to see to the men; to see that they did their work, and order them what to do and how to do it; every thing in general; to direct the men as to the manner of doing their work; I discharged men when they did not do their work;I was not empowered *641 to employ men except with the permission of the superintendent, Mr. C. R. Westbrook.”
Two important facts were in issue upon the trial: (1) Was the draw-iron which broke previously fractured? (2) Did Johnson know before the accident that the draw-iron was fractured? The witnesses called by both sides testified that early in the morning of the accident, a fracture was found in the draw of one of the cars' then being used for drawing ore out of the mine; which fact Johnson testified that he knew.
But the more important fact in issue, upon the decision of which this case may be said to. turn, is, was this fractured draw-iron the one that gave way and caused the plaintiff’s injury ?
At the time of the accident, there were, as Johnson testified, but five cars at the mine; one of which had a fractured draw-iron. He testified that this car with the defective draw-iron was in the forenoon of the day of the accident placed by Willard Lee and others on a side track in the west tunnel and was not in use at the time of the accident. Alexander Aslow testified that he discovered the fracture in this draw-iron the night before the accident; that the next morning that car was put on the side track in the west tunnel, and was not taken away until a week after the accident. On the contrary, Willard Lee testified that he did not shove the car with the fractured draw-iron into the west tunnel, as testified by Johnson. But on the contrary, testified: “Q. What do you know as to that being the car that finally broke that day? A. Well, I think it is. * * * Q. Do you know anything about it ? A. I know I was using it on the track, and I know that the other one was not cracked afterwards.”
The evidence that the car with the fractured draw-iron was placed on the side track in the west tunnel was given in behalf of the defendant after the plaintiff had rested his case. When the plaintiff took the case, Lee testified that he did not aid in placing this car on the side track, and the plaintiff offered to prove by Bacon and another employee that the car with the fractured draw-iron was not placed on the side track in the west tunnel; but the evidence was rejected upon the theory that it was a re-opening of the plaintiff’s case.
Four witnesses, sworn in behalf of the plaintiff, testified that they examined, after the accident, the broken draw-iron and found an old fracture in it at the point where it gave way. The draw-iron broke at about the place where the fracture was seen in the draw-iron on one of the cars before the accident. Five witnesses, sworn in behalf of the *642 defendant, testified that they examined, after the accident, the broken draw-iron, and it was a new, fresh break, showing no evidence of a previous fracture. Two' experts were sworn by the defendant, who testified that a sound draw-iron of the size of the one that broke, would draw out of the mine with safety many tons more than were being drawn out on this' occasion.
The defendant sought to explain the break upon the theory that the car on its way out left the track, producing a sufficient strain to break the draw-iron, and that after-wards the car, on its downward course, regained the track and ran upon it down to the point of collision.
Under the evidence, it was a fair question of fact for the jury to determine whether the draw-iron which broke was the fractured one which was discovered and the foreman’s attention called to in the forenoon of the day of the accident; and if it was, the jury were justified in finding that the use of the car was actionable negligence on the part of the defendant.
The plaintiff cannot be charged, as a matter of law, with having negligently contributed to his own injury, because he was walking between the rails, or near the rails, while aiding in pushing the empty car to its place.
_ Some of the plaintiff’s witnesses testified that the ice was piled up three or four feet high on each side of the track. Johnson testified that the ice was five or six inches thick before it was disturbed, and that it was taken away for the distance of from one to two feet outside of each rail, and thrown up on the adjoining ice, forming a bank or ridge, but not as high as testified by the plaintiff’s witnesses. How far the body of these cars projected over the wheels, if at all, does not appear. Whether it was negligence for these employes to attempt to push this car into place by traveling behind it, or, in other words, whether due care required them to move the car by traveling outside the track and pushing against the sides, was clearly a question of fact for the jury. Their orders were to push the empty car back to-its place and load it while- the loaded car was going to and returning from the dump.
This case was very carefully submitted to the jury, by the learned trial judge, and not at all unfavorable to the views of the. defendant, and no error has been pointed out which calls for a reversal of the judgment.
The only remaining question is as to the effect of this-action being prosecuted down to the trial by an infant without a guardian ad litem.
At the date of the trial, September, 1886, the plaintiff' was an infant, of which fact the defendant was ignorant-until September 21, 1886, when its superintendent was told. *643 ■that plaintiff would not become twenty-one years of age until October 3, 1886; which fact plaintiff afterwards testified to on his cross-examination.
At the close of the evidence, September 25, 1886, the defendant moved for a non-suit, and that the cause be nót submitted to the jury because the action was prosecuted by an infant, without a guardian, which motion was denied; and thereupon the court appointed a guardian ad litem for the plaintiff, by an order directed to be entered, and to take effect as of a date prior to the service of the summons; and all of the papers theretofore served were directed to be appropriately amended. The defendant, by an exception to the refusal to non-suit, and by appealing from the order, presents the question that all previous proceedings in the action were invalid, the court without jurisdiction and without power to grant the order or cure the defect ab ■initia.
The Code of Civil Procedure provides: “Section 469. Before a summons is issued, in the name of an infant plaintiff, a competent and responsible person must be appointed to appear as bis guardian for the purpose of the action, who shall be responsible for the costs thereof.”
It has been twice held under this section that the omission of the plaintiff to prosecute by guardian is not jurisdictional, but a mere irregularity, which was waived unless set up in the answer, and no cause for dismissing the complaint. Smart v. Haring, 14 Hun, 276; Sims v. The N. Y. College of Dentistry, 35 id., 344. The same rule was held under the old Code. Rutter v. Puckhafer, 9 Bosw., 638; Parks v. Parks, 19 Abb., 161; Treadwell v. Bruder, 3 E. D. Smith, 596; 1 Wait’s Pr., 486. The Revised Statutes provided (2 R. S., 446) section 2: “Before any process shah be issued in the name of an infant who is sole plaintiff in any suit, a competent and responsible person shall be appointed to appear as next friend for such infant in such suit, who shall be responsible for the costs thereof.” Under this section, it was held that when an infant prosecuted without a guardian, the defect might be taken advantage of by plea in abatement, but not in bar, or by way of nonsuit upon the trial. Fellows v. Niver, 18 Wend., 563. Such was the rule at common law. 1 Chit. Pl. (16 Am. ed.), 464; 1 Chit. Arch. Pr. (12 ed.), 240.
In Imhoff v. Wurtz (9 N. Y. Civil Pro. Rep., 48), an action prosecuted by an infant plaintiff was dismissed at the trial without costs, and the application for the appointment of a guardian ad litem was refused. In that case the county court said there was a distinction between a case in which the plaintiff became of age before the trial, and one in which the plaintiff was not of age at the trial. It is *644 difficult to see how the court acquired jurisdiction in one-case but not in the other. Imhoff v. Wurtz is contrary to the weight of authority, and was properly disregarded by the circuit court, which committed no error in refusing to nonsuit, or in appointing a guardian ad litem.
The judgment and orders are affirmed, with costs. Hardin, P. J., and Martin, J., concur.